Steve A. SANDEFUR, Plaintiff,

v.

Samuel LEWIS, et al., Defendants.

Steve A. SANDEFUR, Petitioner,

v.

Samuel LEWIS, et al., Respondents.

Nos. CV 95–297 TUC–WDB,
CV 95–312 TUC–WDB.

United States District Court,
D. Arizona.

Aug. 14, 1996.

---

6. *See supra* n. 2.

Steve Sandefur, Goodyear, AZ, pro se.

Wanda Ellen–Marie Hofmann, Arizona Attorney General, Insurance Defense, Tucson, AZ, for respondents.

### ORDER

WILLIAM D. BROWNING, District Judge.

Pending before the Court in CIV–95–297–TUC–WDB is Defendants' April 17, 1996 Motion for Summary Judgment. Pending before the Court in CIV–95–312–TUC–WDB is Petitioner's May 18, 1995 Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. For the following reasons, the Court will grant the Motion, deny the Petition, and dismiss these actions with prejudice.

### I. Factual and Procedural Background

On December 30, 1994, Plaintiff was an inmate confined to the Santa Rita Unit at the Arizona State Prison Complex in Tucson, Arizona. Prison officials received information that Plaintiff was involved in the planning of a racially-based disturbance that was to occur on January 15, 1995. On January 4, 1995, as a preemptive measure to avoid the race disturbance, prison officials removed Plaintiff from the general population and placed him in the Santa Rita lockup facility. The next day, prison officials transferred Plaintiff to the more secure Cimarron Unit of the Tucson complex.[1]

On January 27, 1995, Plaintiff was served an "Institution Classification Referral Notice" informing him that he would be brought before the Institutional Classification Committee (ICC) to determine the appropriateness of changing Plaintiff's prison security risk scores based on the information implicating him in the planned racial disturbance. The ICC represents the first of three levels of review in the security reclassification process under Arizona prison regulations.

On February 6, 1995, the ICC met in executive session (without Plaintiff present) and interviewed confidential informants to determine the reliability of the information they had provided concerning Plaintiff's involvement in the planned disturbance. The ICC deemed the information reliable. Later on that same day, the ICC conducted a hearing at which Plaintiff was present. The parties dispute whether Plaintiff was allowed to make a statement on his own behalf. The parties do *not* dispute that Plaintiff requested, but was denied, the opportunity to call witnesses and the opportunity to review the confidential information on which the ICC based its decision to reclassify him. After the hearing, the ICC recommended an increase in Plaintiff's security classification.

---

1. The parties disagree as to what happened to Plaintiff following his initial detention in the Santa Rita Lockup facility. Defendants contend that, after only one day in the Santa Rita Lockup, Plaintiff was transferred to the general population at the Cimarron Unit, and then, on February 10, 1995, Plaintiff was confined to the Cimarron

Lockup facility where he remained until May 26, 1995. *See* Defendants' Court Ordered Report, filed July 11, 1996, Ex. A (Vanelli Affidavit) at ¶ 6. Plaintiff insists, however, that he was confined to administrative segregation the entire time between January 5–May 26, 1995. *See* Plaintiff's Affidavit, filed July 18, 1996, ¶ 3.

Defendant Vanelli, deputy warden at the Santa Rita Unit, concurred with the ICC's recommendation. Review by the deputy warden constitutes the second level of review in the reclassification process.

Then, on March 24, 1995, the Arizona Department of Corrections (ADOC) Central Classification Office, which holds the final authority in the reclassification process, approved an increase in Plaintiff's classification (albeit smaller than the one recommended by the ICC and Defendant Vanelli) and authorized the transfer of Plaintiff to the Arizona State Prison Complex in Winslow, Arizona. After unsuccessfully appealing the reclassification decision, Plaintiff remained in the Cimarron lockup facility until May 26, 1995, when he was transferred to the Winslow prison. It is undisputed that Plaintiff did not lose any good time credits, or suffer any increase in sentence length, as a result of the aforementioned reclassification and transfer.

On May 12, 1995, Plaintiff filed CIV-95-297-TUC-WDB, an action pursuant to 42 U.S.C. § 1983.[2] Plaintiff's Amended Complaint, filed October 6, 1995, alleges that Defendants violated his Fifth, Eighth, and Fourteenth Amendment rights when they locked him down under investigation without first affording him some kind of hearing. The Amended Complaint further alleges that Defendants held a classification hearing in which Plaintiff was not allowed to call witnesses, obtain and present information that he requested, or make a statement on his own behalf. In addition, Plaintiff complains that the resulting classification increase was arbitrarily approved and that he was denied meaningful appeal of the increase.[3] Plaintiff

seeks return to his previous security classification, prison employment similar to that he had prior to the incidents of which he complains, compensatory damages, and attorney's fees.

. . . . .

## II. Defendants' Motion for Summary Judgment

### A. Parties' Arguments

Defendants argue that there are no extant genuine issues of material fact and that they are entitled to judgment as a matter of law. First, Defendants assert that Plaintiff does not have a liberty interest protected by the Due Process Clause in prison classification matters. Thus, absent the threshold protectable liberty interest, Plaintiff is not constitutionally entitled to due process. Second, Defendants contend that they are entitled to qualified immunity as to all claims.

In response, Plaintiff asserts that he has a due process liberty interest in remaining free from administrative detention and arbitrary reclassification. He maintains that material issues of fact remain with respect to whether he received procedural due process before and after being placed in detention, whether he received procedural due process at his classification hearing, and whether Defendants arbitrarily denied his appeal of the reclassification decision. Finally, Plaintiff argues that Defendants are not entitled to qualified immunity.

### B. Summary Judgment Standard

■ Summary judgment is appropriate when "the pleadings, depositions, answers to

---

**2.** On May 18, 1995, Plaintiff filed a petition for writ of *habeas corpus* (CIV-95-312-TUC-WDB), requesting that the Court order Defendants to release Plaintiff from administrative segregation. In doing so, Plaintiff seeks relief substantially similar to that which he seeks in the instant § 1983 action. Because Plaintiff can receive the relief he requests, if at all, in his § 1983 action, the Court will dismiss the petition for writ of *habeas corpus*.

**3.** The Court notes that the Amended Complaint also alleges that Defendant Samuel Lewis failed to first file proposed policies and procedures with the Arizona Secretary of State before im-

plementing them. Plaintiff does not attempt to allege how this failure actually damaged him; indeed, the Court cannot imagine a set of circumstances in which Plaintiff could have suffered actual damage from Lewis' alleged failure. Absent such harm, Plaintiff cannot state a cognizable claim under 42 U.S.C. § 1983. *See Lewis v. Casey,* —— U.S. ——, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (requiring prisoner plaintiff to prove actual harm in order to state a claim). Moreover, Defendant Lewis' failure to file affects a matter that only concerns *state* law and, therefore, is not cognizable under 42 U.S.C. § 1983. Accordingly, the Court will dismiss the Amended Complaint insofar as it complains of Defendant

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party need only identify those parts of the record that demonstrate the absence of a genuine issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.1990).

A party opposing summary judgment, however, may not rest on its pleading. Fed. R.Civ.P. 56(e). Instead, that party must set forth "by affidavit or as otherwise provided by [Rule 56] ... specific facts showing that there is a genuine issue for trial." *Id.; see also Musick*, 913 F.2d at 1394. When judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence. *Id.*

### C. Analysis

Reduced to their essence, Plaintiff's claims are twofold:

1. Denial of procedural due process with respect to his placement into administrative segregation; and

2. Denial of procedural due process with respect to the reclassification hearing (and appeal mechanism) that resulted in an increase in his classification and transfer to a more secure institution.[4]

These claims are familiar to the Court if for no other reason than they repeat themselves *ad infinitum* in Arizona prison litigation. This case is unique, however, because it presents the Court with the opportunity to impose a needed degree of clarity in the area of Arizona prison due process in light of the United States Supreme Court's recent deci-

sion in *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

#### 1. Due Process Liberty Interest

When a plaintiff brings an action under 42 U.S.C. § 1983 for procedural due process violations, he must show that the state deprived him of a constitutionally protected interest in "life, liberty, or property" without due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (citing *Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1981)). In the absence of such a constitutionally protected interest, the Constitution does not require the provision of *any* process. *See Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548 (1971).

A liberty interest may arise from the Due Process Clause itself or from state law. *Smith v. Noonan*, 992 F.2d 987, 989 (9th Cir.1993). A prisoner has no liberty interest arising under the Due Process Clause in remaining in the general prison population. *Hewitt v. Helms*, 459 U.S. 460, 467–68, 103 S.Ct. 864, 868–70, 74 L.Ed.2d 675 (1983). *Ipso facto*, a prisoner has no liberty interest arising under the Due Process Clause in remaining free from administrative segregation, *Smith*, 992 F.2d at 989, or disciplinary segregation, *Sandin*, —— U.S. at ——, 115 S.Ct. at 2302. If a liberty interest in remaining free from segregation exists at all, it must be created by state law. *Smith*, 992 F.2d at 989 (citing *Hewitt*, 459 U.S. at 468, 103 S.Ct. at 869).

Similarly, with respect to classification, it is well-established that the Due Process Clause does not provide a liberty interest by its own force. *Hewitt*, 459 U.S. at 468, 103 S.Ct. at 869–70. Again, therefore, if a prisoner has a due process liberty interest in

---

Lewis' alleged failure to file proposed policies and procedures with the Secretary of State.

4. The Court expressly rejects Plaintiff's allegation that his administrative segregation and reclassification also violated his *Eighth* Amendment protection against cruel and unusual punishment. Neither his segregation nor the subsequent reclassification featured the insidious and barbarous conduct the Eighth Amendment has been construed to prohibit. To be cognizable under the Eighth Amendment, the conduct complained

of must "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *see also Farmer v. Brennan*, 511 U.S. 825, ——, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (Eighth Amendment is concerned with necessities such as "adequate food, clothing, shelter, ... medical care, and ... safety."). Because the Amended Complaint contains no allegations of excessive force, poor medical care, or inhumane conditions of confinement, the Court concludes that the Amended Complaint sounds in procedural due process, if at all.

his security classification at all, such an interest must arise from state law.

In *Sandin*, the United States Supreme Court recently changed the methodology for determining whether a liberty interest in the prison context arises under state law. Prior to *Sandin*, federal courts analyzed prison regulations to determine whether they (1) contained "substantive predicates" governing a prison official's decision regarding a matter directly related to the individual and (2) featured "explicitly mandatory language" dictating the result that must be reached when the substantive predicates were satisfied. *Dix v. County of Shasta*, 963 F.2d 1296, 1299 (9th Cir.1992) (quoting *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462–63, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989)). The Supreme Court believed that this analytical construct improperly shifted the liberty interest focus away from the nature of the deprivation to the language of the regulation, and thus "encouraged prisoners to comb regulations in search of mandatory language on which to base [due process claims]." *Sandin*, —— U.S. at ——, 115 S.Ct. at 2299. Abandoning the two-step analysis, the Supreme Court embraced a new test that drastically limits the number of due process liberty interests previously enjoyed by prison inmates: a due process liberty interest arising from *state* law

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force.... nonetheless imposes *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

—— U.S. at ——, 115 S.Ct. at 2300 (emphasis added).

■ In the wake of *Sandin*, it is clear that there are only two instances in which a prisoner may claim a protected liberty interest: (1) when the prison's actions have the effect of altering the term of imprisonment (*ie.* revocation of good time credits), which is protected by the Due Process Clause by its own force, and (2) when a state prison regulation proscribes a prison official's conduct *and* the conduct imposes an "atypical and

significant hardship" on the inmate. *Compare Frazier v. Coughlin*, 81 F.3d 313, 317 (2nd Cir.1996), *Thomas v. Newkirk*, 905 F.Supp. 580, 582 (N.D.Ind.1995), and *Knecht v. Collins*, 903 F.Supp. 1193, 1198 (S.D.Ohio 1995). Stated another way, when a prisoner claims a liberty interest arises from a state prison regulation, the proper analysis is whether the particular discipline imposed on the prisoner " 'present[s] the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.' " *Mujahid v. Meyer*, 59 F.3d 931, 932 (9th Cir. 1995) (quoting *Sandin*, —— U.S. at ——, 115 S.Ct. at 2301); *see also Rodriguez v. Doe*, 919 F.Supp. 361, 365 (D.Or.1996); *Neal v. Shimoda*, 905 F.Supp. 813, 817–18 (D.Haw. 1995).

Given that general background, it is now the task of the Court to ascertain whether Plaintiff has a liberty interest either in remaining free from administrative segregation or in the reclassification process.

#### a. Liberty Interest in Remaining Free from Administrative Segregation?

■ The parties dispute the length of time to which Plaintiff was subjected to administrative segregation. Construed in the light most favorable to Plaintiff—the appropriate lens through which to examine the evidence at this stage—the evidence indicates that Plaintiff's administrative segregation spanned 141 days, from January 5, 1995 to May 26, 1995. *See* Plaintiff's Affidavit, filed July 18, 1996, ¶ 3. Indeed, it is *undisputed* that Plaintiff was confined to administrative segregation from February 10, 1995 to May 26, 1995, a period of 106 days. *See* Defendants' Court Ordered Report, filed July 11, 1996, Exh. A, ¶¶ 8–10.

In the short time since *Sandin*, the Ninth Circuit has not specifically addressed whether a segregation of this duration animates constitutional due process. The Court's path through the relatively uncharted post-*Sandin* prison due process wilderness is not totally unilluminated, however. Federal courts outside this Circuit have expressly decided whether various periods of administrative or disciplinary segregation give rise to a due process liberty interest under the particular

prison regulation in question. The overwhelming majority of these decisions counsel against the cognizance of a liberty interest in this case. *See, e.g., Bonner v. Parke,* 918 F.Supp. 1264, 1270 (N.D.Ind.1996) (three years in segregation does not by itself create an atypical and significant hardship); *Thomas v. Ramos,* 918 F.Supp. 228, 233 (N.D.Ill. 1996) (seventy days in segregation not enough to create liberty interest); *Stone–Bey v. Barnes,* 913 F.Supp. 1226, 1233 (N.D.Ind. 1996) (one year not enough); *Bruns v. Halford,* 913 F.Supp. 1295, 1304 (N.D.Iowa 1996) (ninety days not enough); *Carter v. Carriero,* 905 F.Supp. 99, 104 (W.D.N.Y.1995) (270 days not enough); *Delaney v. Selsky,* 899 F.Supp. 923, 927 (N.D.N.Y.1995) (197 days not enough); *Uzzell v. Scully,* 893 F.Supp. 259, 262–63 (S.D.N.Y.1995) (forty-five days not enough); *Smith v. District of Columbia,* 1996 WL 61775 (D.D.C. Jan. 26, 1996) (three months not enough); *Rivera v. Coughlin,* 1996 WL 22342 (S.D.N.Y. Jan. 22, 1996) (eighty-nine days not enough); *Brooks v. DiFasi,* 1995 WL 780976 (W.D.N.Y. Dec. 29, 1995) (180 days not enough); *Tulloch v. Coughlin,* 1995 WL 780970 (W.D.N.Y. Dec. 22, 1995) (180 days not enough); *but see Lee v. Coughlin,* 902 F.Supp. 424, 431 (S.D.N.Y. 1995) (376 days in segregation is atypical and significant hardship, thus giving rise to due process liberty interest under New York state prison regulation). In light of these authorities, the Court is persuaded that Plaintiff's 141–day stay in segregation, by itself, did not impose upon him an atypical and significant hardship in relation to the ordinary incidents of his prison life.

■ The Court's task, however, is not yet completed. In addition to considering the duration of segregation, the Ninth Circuit also has instructed the district court to examine "the various custodial conditions at the particular prison in question." *Gotcher v. Wood,* 66 F.3d 1097, 1101 (9th Cir.1995), *pet'n for cert. filed.* No. 95–1385 (Feb. 26, 1996). Although *Gotcher* involved *disciplinary* segregation, the Court is persuaded that a similar analysis should apply in the context of administrative segregation. Here, the undisputed evidence demonstrates that, while segregated, Plaintiff generally was confined to his cell and moved only in restraints and under escort. Plaintiff was fed in his cell and had his recreation and shower time scheduled. *See* Defendants' Court Ordered Report, filed July 11, 1996, Exh. A. In addition, Plaintiff experienced a minor reduction in law library access, phone calls, family visits, and clothing selection. *See* Plaintiff's Response to Court Order Requesting Add'l Briefing, Dated July 18, 1996. Nonetheless, the Court is convinced that these conditions do not greatly exceed "what one could expect from prison life generally." *Williams v. Ramos,* 71 F.3d 1246, 1249 (7th Cir.1995). The conditions imposed on Plaintiff while segregated do not deviate disproportionately from those imposed on inmates at the most secure general population unit at the Tucson prison complex (the Cimarron Unit). *See* Defendants' Report, *supra,* Exh. A. Moreover, the Court is mindful that the conditions of Plaintiff's segregation do not differ markedly from those at issue in *Sandin.* Finally, it is worthy of mention that prison life by its very nature is restrictive, burdensome, and unpleasant.

Accordingly, having considered the duration of segregation and the concomitant differences in treatment of segregated inmates as compared to general population inmates at the Tucson prison complex, the Court concludes as a matter of law that the segregation in question did not impose an "atypical and significant hardship" on Plaintiff so as to create a due process liberty interest under any Arizona state prison regulation. There being no constitutionally-protected liberty interest, Plaintiff was not entitled to due process of law. His claim that he was denied procedural due process must therefore fail insofar as it relates to his administrative segregation.

### b. *Liberty Interest in the Classification Process?*

Plaintiff also complains that he was denied procedural due process at his security reclassification hearing. It is well-established that the Due Process clause itself does not afford a prisoner a liberty interest in his or her security classification. *Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869–70; *Meyer v. Reno,* 911 F.Supp. 11, 17 (D.D.C.1996); *see also Mea-*

*chum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no liberty interest in particular prison assignment). Therefore, as with administrative segregation, if a prisoner has a due process liberty interest in his security classification at all, such an interest must arise from state law, *Smith,* 992 F.2d at 989, using the *Sandin* methodology.

 Two reasons compel the Court to conclude that Plaintiff has no liberty interest created under Arizona law or applicable prison regulations in his security classification. First, as one court has posited, claiming a liberty interest in one's security classification is analogous to claiming a liberty interest in remaining in the general population. *Slezak v. Evatt,* 21 F.3d 590, 594 (4th Cir.1994). The Court addressed and resolved this issue against Plaintiff in the foregoing discussion on administrative segregation. *See supra* pp. 895–896. Second, the Court is persuaded that an increase in an inmate's security classification does not impose an atypical hardship in relation to ordinary prison life. Indeed, as a matter of course, inmates receive regular classification reviews. Adjustments (both upward and downward) to one's security classification are routine and predictable events in the life of an incarcerated felon. Thus, the Court holds as a matter of law that no liberty interest exists under Arizona state law by the bare fact of reclassification; instead, reclassification will spawn a liberty interest under state law only if the reclassification directly leads to an "atypical and significant" hardship (*ie.* extremely long-term segregation). Here, Plaintiff's reclassification led at worst to a 141–day segregation and transfer to a higher security prison, which the Court already has decided did not implicate a due process liberty interest. There being no protectable liberty interest in a reclassification hearing that resulted only in a 141–day segregation and transfer to a more secure prison. Plaintiff was not entitled to due process.

### III. Conclusion

Having decided that Plaintiff had no due process liberty interest either in remaining free from a 141–day segregation or in his security reclassification hearing, the Court concludes that no genuine issues of material fact remain to be decided, and Defendants are entitled to judgment as a matter of law. Accordingly, IT IS **ORDERED** that:

1. Defendants' April 17, 1996 Motion for Summary Judgment (in CIV–95–297–TUC–WDB) is **GRANTED;**

2. Petitioner's May 18, 1995 Petition for Writ of Habeas Corpus (CIV–95–312–TUC–WDB) is **DENIED;**

3. All other pending motions are **DENIED** as moot; and

4. These actions are **DISMISSED WITH PREJUDICE.**